DANNY R. ADKINS, Defendant Below, Appellant,
v.
STATE OF DELAWARE, Plaintiff Below, Appellee.
No. 271, 2009.
Supreme Court of Delaware.
Submitted: February 24, 2010.
Decided: March 15, 2010.
Before HOLLAND, BERGER and JACOBS, Justices.

ORDER
RANDY J. HOLLAND, Justice.
This 15th, day of March 2010, it appears to the Court that:
1) The defendant-appellant, Danny R. Adkins ("Adkins"), appeals from final judgments of conviction in the Superior Court for Rape in the Second Degree, Endangering the Welfare of a Child, and four counts of Unlawful Sexual Conduct in the Second Degree. In this direct appeal, Adkins argues that the Superior Court erred by failing to sua sponte: (1) remedy what he alleges was the prosecution's improper vouching for the complaining witness, and (2) declare a mistrial after certain comments the complaining witness made while testifying at trial. We have determined that both of those arguments are without merit.
2) In June 2008, A.S., born in 1995, was visiting her uncle, Adkins.[1] One evening, A.S., Adkins, his wife Hope Adkins ("Hope") and their three-year old grandson watched a movie in the Adkins' bedroom. While the four were in the bed, Adkins touched and penetrated A.S.'s vagina with his finger and forced her to place her hand on his penis.
3) Later that summer, A.S. told family friends, Tom and Trucee Kelley, about what had happened. She also wrote a note to her father describing Adkins' conduct. A.S.'s father contacted the police, and A.S. was interviewed by the Children's Advocacy Center ("CAC"). Adkins was arrested on July 31, 2008, and later was charged by Information with three counts of Rape in the Second Degree, one count of Endangering the Welfare of a Child and four counts of Unlawful Sexual Conduct in the Second Degree.
4) In his opening statement, the prosecutor told the jury that A.S. came forward "knowing that [doing so] ran the risk of upsetting her father," and "divid[ing] the family." In his closing argument, the prosecutor made similar remarks, telling the jury that the case was "about a child and costs of coming forward," that A.S. "wants to be believed," and that her story was not fabricated. Additionally, on direct examination the prosecutor asked A.S. whether her out-of-court statements to the Kellys, her father and Ralph "Buster" Richardson of the CAC were truthful. Those statements were introduced as evidence under title 11, section 3507 of the Delaware Code.[2]
5) The jury found Adkins guilty of all but one count of Rape in the Second Degree. The Superior Court later dismissed an additional count of Rape in the Second Degree on grounds of multiplicity. Adkins was sentenced to twenty-five years at level V, suspended after fifteen years for the remaining Rape in the Second Degree conviction, and two years at Level V, suspended for two years at Level III for each of the other convictions.
6) For the first time on appeal, Adkins claims that the prosecutor improperly vouched for A.S.'s credibility when giving his opening statement and closing argument, and when asking A.S. about the truthfulness of her out-of-court statements. Because Adkins did not object to these remarks at trial, our standard of review is for plain error.[3] Under this standard, we first review the record de novo to determine whether an error occurred. If we determine that no error occurred, our analysis ends.[4] If, however, an error did occur, we will find grounds for reversal only where the error is:
so clearly prejudicial to substantial rights as to jeopardize the fairness and integrity of the trial process. Furthermore, the doctrine of plain error is limited to material defects which are apparent on the face of the record, which are basic, serious and fundamental in their character, and which clearly deprive an accused of a substantial right, or which clearly show manifest injustice.[5]
In this case, we need not reach the second stage of a plain error analysis, because no misconduct occurred.
7) "Improper vouching occurs when the prosecutor implies some personal superior knowledge, beyond that logically inferred from the evidence at trial, that the witness has testified truthfully."[6] The prosecutor's questions regarding the truthfulness of A.S.'s out-of-court statements were permissible. The prosecutor properly asked those questions to establish a foundation for introducing A.S.'s statements into evidence.[7]
8) The prosecutor's comments during the State's opening statement and closing argument were also permissible. All of those comments, when viewed in context, either stated a fact or were directly tied to and suggested a logical inference from the evidence.[8] The prosecutor's comments during his opening statement that A.S. came forward knowing that she "ran the risk of upsetting her father" and dividing the family, stated facts that were later substantiated by evidence presented at trial. A.S.'s father testified that he was very upset by A.S.'s note,[9] and six of A.S.'s family members (including A.S.'s brothers) testified in support of Adkins. Nothing in those comments suggested that the prosecutor had superior knowledge that A.S. would testify truthfully.
9) That analysis also applies to the prosecutor's comments during closing arguments. In response to Adkins' defense that A.S.'s allegations were fabricated, the prosecutor reviewed the evidenceincluding the alleged inconsistencies in the State's casein an effort to convince the jury that a claim of fabrication was not supported by the evidence.[10] Similarly, by referring to the "costs" of coming forward, the prosecutor asked the jury to evaluate A.S.'s motivations, and how those motivations affected her credibility.[11] The prosecutor is entitled to argue facts from the evidence supporting why the victim is believable when her credibility is directly at issue.[12] In closing arguments, prosecutors are allowed to make and explain inferences from the evidence that support the State's theory of its case against the defendant.[13] In Adkins' case, because the prosecutor did not make improper statements to the jury, there is no plain error.
10) Adkins claims, also for the first time on appeal, that the trial judge erred in failing to declare a mistrial after A.S.'s cross examination revealed that she had discussed her testimony with other witnesses during the trial. We review the denial of a motion for a mistrial for abuse of discretion.[14] Here, however, because Adkins never moved for a mistrial, our review is for plain error.[15] "A trial judge should grant a mistrial only where there is a manifest necessity or the ends of public justice would be otherwise defeated. The remedy of a mistrial is mandated only when there are no meaningful and practical alternatives to that remedy."[16]
11) On the second trial day, during cross-examination by defense counsel, A.S. testified that she had spoken with the Kellys after hearing their testimony, and that she told them that Tom was wrong when he testified that A.S. told Hope about Adkins' abuse.[17] After the jury left the courtroom, the trial judge recalled A.S. and asked her why her conversation with the Kellys took place, despite the trial judge's admonition not to talk about her testimony. A.S. explained that "I had to get it off my mind." The trial judge sua sponte raised and rejected the possibility of declaring a mistrial. Defense counsel then informed the Superior Court that he was not asking for a mistrial.[18]
12) Adkins fails to offer a reasonable explanation for how A.S.'s violation of the trial judge's instructions prejudiced him, so as to create a "manifest necessity" to declare a mistrial. Adkins argues that A.S. bolstered her own credibility by testifying that she had told the Kellys they were wrong. But, whether or not the jury believed that statement, it could only damage the State's case, because both A.S. and the Kellys were prosecution witnesses. If the jury believed A.S.'s statement that the Kellys were wrong, the credibility of their testimony suffered.[19] If the jury did not believe A.S., her credibility suffered. Because no prejudice to Adkins would result, the trial judge properly decided not to declare a mistrial sua sponte. That decision was supported by defense counsel's statement that he was not requesting a mistrial. By making a tactical decision not to request a mistrial, Adkins has waived any claim of plain error in this direct appeal.[20]
NOW, THEREFORE, IT IS HEREBY ORDERED that the judgments of the Superior Court are affirmed.
NOTES
[1] A.S. is a minor and therefore referred to by a pseudonym at this Court's discretion, pursuant to Supreme Court Rule 7(d).
[2] Del. Code Ann. tit. 11, § 3507(a) provides that "[i]n a criminal prosecution, the voluntary out-of-court prior statement of a witness who is present and subject to cross-examination may be used as affirmative evidence with substantive independent testimonial value."
[3] Torres v. State, 979 A.2d 1087, 1093-94 (Del. 2009).
[4] Id. at 1094.
[5] Baker v. State, 906 A.2d 139, 150 (Del. 2006) (quoting Wainwright v. State, 504 A.2d 1096, 1100 (Del. 1986)).
[6] White v. State, 816 A.2d 776, 779 (Del. 2003) (citing Miller v. State, 2000 WL 313484, at *4 (Del. Feb. 16, 2000)).
[7] See Ray v. State, 587 A.2d 439, 443 (Del. 1991) ("[A] witness' statement may be introduced [under 11 Del. C. § 3507] only if the two-part foundation is first established: the witness testifies about both the events and whether or not they are true.")
[8] Czech v. State, 945 A.2d 1088, 1099 (Del. 2008) (holding that prosecutor's comment in a sexual abuse case that "five-year olds don't make that stuff up" was directly tied to the evidence and suggested a logical and proper inference from that evidence).
[9] Direct Examination of A.S.'s Father:

Q: Tell me what State's 1 is? How are you familiar with it?
A: That's the note that A.S. wrote me.
Q: Okay. Where were you when you got that?
A: At home.
Q: Can you tell me what happened?
A: Yeah, I got really upset ...
[10] "She wants to be believed. That is clear from this letter [to her father]. Yet she goes through and fabricates a story where her aunt is in the room.... Does that make sense?"
[11] Czech v. State, 945 A.2d at 1099 (holding that prosecutor's argument that rape is not a subject about which five-year olds would generally have any familiarity did not imply a superior knowledge, but rather was asking the jurors to draw on their collective life experience when evaluating the general sexual knowledge of a very young child); Torres v. State, 979 A.2d at 1096 (holding that prosecutor did not suggest that he held any additional personal knowledge that a witness was telling the truth by mentioning that the witness had entered into a plea agreement with the state, but rather argued that the agreement was likely to incentivize the witness not to lie).
[12] See Holland v. State, 2005 WL 119744, at *1-2 (Del. Jan. 18, 2005) (finding prosecutor's statements in rebuttal, explaining that it was the testifying detective's story that was "consistent" and "laden with certainty," not prejudicial because they were offered "in response to defense counsel's own credibility-based comments.").
[13] Mills v. State, 2007 WL 4245464, at *3 (Del. Dec. 3, 2007).
[14] Purnell v. State, 979 A.2d 1102, 1108 (Del. 2009).
[15] Czech v. State, 945 A.2d at 1098. We note that the possibility of declaring a mistrial was raised by the Superior Court, sua sponte, and that Adkins' counsel told the Court that he was not asking for a mistrial. Therefore, Adkins could be viewed to have waived this claim, making it not reviewable. Id. at 1097-98; MacDonald v. State, 816 A.2d 750, 756 (Del. 2003) (holding that defendant was precluded from any claim of plain error on appeal because he waived his right to object to certain comments made by the prosecutor during trial).
[16] Banther v. State, 977 A.2d 870, 891 (Del. 2009) (citations and internal quotation marks omitted).
[17] When cross-examined, A.S. denied that she had told Hope about Adkins' acts. The following exchange then took place:

Q: You were in the courtroom yesterday when Mr. Kelly and Mrs. Kelly testified?
A: Yes.
Q: And do you recall them saying that you told Hope about this?
A: Yes.
Q: That wasn't true?
A: They had told me that they had made a mistake.
Q: So you have talked to them since then?
A: Yes.
Q: And they told you that they made a mistake?
A: Yes.
[18] After A.S. stepped down, the following exchange took place:

THE COURT: All right. I don't know what to do with it. I don't think we are going to do a mistrial.
MR. CALLAWAY: I am not asking for one.
THE COURT: All right. At least, we flushed it out.
[19] Moreover, A.S.'s statement supported Hope's testimony that A.S. did not disclose the abuse to her.
[20] Wright v. State, 980 A.2d 1020, 1024 (Del. 2009).